The State of Arizona State Board of Trustees of the United States of America         at 2 p.m. We will begin at 2 p.m. We will begin now in session. Please be seated. Good afternoon Welcome to Pasadena to United States Court of Appeals our courts here in Pasadena The matter set for our argument is Mackenzie Brown v. State of Arizona and Richard A. Rodriguez of the U.S. Department of Education The parties are ready to proceed You may come forward to begin Thank you, your honor I'm Alexandra Brodsky for Appellant Mackenzie Brown If I may, I'd like to take another five minutes for rebuttal A school has control over the context of sexual harassment It has the practical power to freely extend disciplinary authority or otherwise to reduce the risk of harassment in the context That's functional standard at the courts of both Davis and the statutory text Petaline, among other things forbid the school from subjecting a student to discrimination under the education program or activity That's the statutory basis for the control over context requirement And Davis, looking at the contemporary dictionary, told us what under means Under means under the regulatory authority of It doesn't mean within as the university seems to assume Elsewhere in the statute, Davis also specifically forbids sex discrimination that excludes the person from participation in or denies them the benefits of the school And another problem with the university's miserly reading of controls is that it forecloses liability for forms of discrimination that are plainly prohibited by those portions of the text. One illustration of this is a hypothetical from our supplemental brief adapted from Davis of a school that's deliberately indifferent to harassment by a group of boys who stand right in front of the schoolhouse gate and harass girls to stop them from The university's reading of control would prohibit liability in these circumstances even though we know from the statutory text that that's one of the principal evils that Congress sought to root out with Title IX And I want to underscore that even in that hypothetical the school is only liable if it had actual knowledge of the harassment if it was deliberately indifferent to the harassment and the harassment was so severe, pervasive and objectively offensive Thank you counsel, forgive me I know you have lots that you'd like to say but what has troubled me about this case is even if you take the approach that you're doing the record as I understand it shows the Title IX office was fully aware of the abuse by Mr. Bradford of student A and Ms. DeRote but that was never passed on as I understand it to the coaching staff If that's true even if you take the university as being the culpable party Justice O'Connor in the Davis case made it very clear that in order to reach the deliberate indifference standard you have to have a person who knew about it and then was deliberately indifferent What I'm troubled about is that the people who had the power over Bradford had his scholarship, they proved his living off campus they had the ability to discipline him in many other ways and of course terminate his being at the university They had the power but they didn't know if they didn't know how could they be deliberately indifferent I know you're going to say it's the university's responsibility but that's not as I understand it what Justice O'Connor said You've got to have a person who's deliberately indifferent so help me please how do we find the university to be deliberately indifferent when the people that had the power to discipline didn't even know about it Your Honor you've anticipated that part of my response would be that the knowledge is attributed to the university as a whole but even if we take it person by person the Title IX office did have significant control over the context because it had disciplinary authority it could initiate the investigation that might have resulted in Bradford being suspended from the school and thus removed from the context of the university life all together but it also wasn't only the Title IX staff that had knowledge By March of 2016 the university's dean of students, senior Title IX investigator and Title IX liaison to the athletics department had notice of abuse of student A and the senior Title IX investigator also told an associate dean about abuse of this group In April 2016 the Title IX liaison, athletic director and dean of students learned about Bradford banging at student A's door for hours That's correct and I think for purposes of your plea we have to do that so they have that knowledge but are you suggesting that the Title IX office will all have the ability to terminate scholarship, kick Bradford off the campus is that correct? There are multiple different kinds of control at issue here so I think that the focus has been on the athletics specific control in part because it's so direct the dean literally had the ability to tell Bradford you cannot live in that house to revoke your scholarship but there are also other kinds of control including the university's control to institute disciplinary investigation but certainly the senior Title IX investigator and the dean of students and the associate dean in charge of student discipline would have been in a position to implement and in so doing they would have avoided deliberate indifference is that your position? So to separate out deliberate indifference control here, Davis was clear that schools have a range of potential remedies at their disposal that I think is in the position to say no you have to do just this one thing that I want but I do think that if the university had initiated an investigation into the abuse of student day groups, had done a reasonable investigation that would have been enough to avoid deliberate indifference. Well the problem is they didn't take what was the most obvious step, they didn't tell the football team even though it was pretty obvious what the football team would have done and we have a predictive testimony from the head coach that they kept it to themselves the only thing they ever told the football team about was the banging on the door. That's absolutely right your honor and I think that that means that even if we look at actual knowledge and deliberate indifference of person by person the best version of this story for the university is that the administrators tasked by the university ensuring student safety from sexual violence and compliance with Title IX failed to do the absolute most basic thing it could have done which is to say hey coach you have a huge amount of control over the life of your man, you should know what's going on here so that you can keep an eye out for it. So that's a very neat screening inter-requestion of deliberate indifference. What's odd about it is they did tell the coaching staff but the only thing they told the coaching staff was they banged on the door even though at that time they knew a lot of really bad things about it. Yes, that's correct and I think that that really underscores the deliberate indeliberate indifference. David said that a school is deliberately indifferent when its response is clearly unreasonable under the known circumstances and it seems like in this situation the university almost went out of its way not to be helpful, not to What's your best illustration of deliberate indifference in this case by the university? I think that the university's utter failure to do literally anything to protect the larger student body once it knew about the student A and yet deepened its If they had the title nine office knew about the first two terrible treatments that my I can't remember his or her failure to have Mr. Bradford terminated as a student in the university, that in and of itself is sufficient deliberate indifference in quotes to state a cause of action in this case. I don't think it's a failure to expel it to him, your honor, because again, David doesn't allow me to say there's one there's only one solution there. I'm just going to give me one. Give me one that you say is an example. I know I'm really empathetic to what happened this is a terrible, terrible thing but Davis is pretty clear in my judgment that you've got to have individual people who know about this and are deliberately indifferent and that's what I'm looking for. Who is the person or the person, even if it affects the university, who was deliberately indifferent in this case? I promise I won't answer that directly. I may just foreground what deliberate indifference is. So Davis says the school is deliberately indifferent when its actions are clearly unreasonable under the known circumstances with the known circumstances here being the knowledge of Bradford's past abuse and a school is deliberately indifferent when it does nothing. A number of courts, including the Fourth Circuit in the Hurley case, which is the Yik Yak harassment case, have said that a school is also deliberately indifferent if its response is not calculated to end the harassment and that's a formulation that the Sixth Circuit has endorsed the Second Circuit has endorsed and here I think there are a number of individuals for whom we can say senior Title IX administrator doing literally nothing to stop Bradford from going to coach what happened. Going out of your way, perhaps, to only give incomplete information to get a sense that what Bradford has done would not require his removal from the team. That's deliberately indifferent. Counsel, does your argument address the context requirement in Davis? I am in control of the context. Yes, Your Honor. So how does deliberate indifference? How does your argument address the requirement that the university control the context of the injury vis-a-vis this particular claim case? Yes, Your Honor. So as you explained, a school has control over the context of harassment when it has the practical power to reduce the risk there and the university here has multiple forms of such power. So what case are you relying upon to support the argument that the university controls the context when it has the power to over the individual? Your Honor, there are a number of cases, including the Fourth Circuit and Hurley that are stronger cases to support the proposition that the university has control over the context when it has control over the individual perpetrator. What's the strongest case for the argument? So I'm going to clarify our position. It's not that in every single circumstance, but when a school has control over the individual, it will automatically have control over the context. But it is that control, disciplinary control over individuals, the ability to regulate conduct, is one way that a plaintiff can establish in under certain circumstances. Other than the fact that the program and the codes have pretty extensive control over the perpetrator. Your Honor, but what is the other material question of fact that would warrant a remand for purposes of trial? Is it the fact that he's on scholarship and presumably the funds were being used to pay for the apartment? Your Honor, there are a number of different sources of power here to tell me the fact. The trial questions a fact that would demonstrate control over context. You've talked extensively about the control over him as a football player. What else do you have? Did school have the ability to determine who was living in that house and what they could do in that house? It also had the ability to the question of fact. What is a record is a question of fact on that that the university had control over who lived in that apartment. We know from 2ER54 that the coaching staff had the ability to determine whether football players, including Bradford and the other people she was living with, could live off campus or not. We also know that they had the power to investigate what happened in that house from 3ER355. And, of course, the school ultimately did regulate the conduct in that house by initiating an investigation. As to whether there's a question of fact, I think it's plausible that McKenzie would have been entitled to summary judgment here, but all this court needs to find at this juncture is that  was not reliant on the scholarship. We are as well, Your Honor. The scholarship was one of the ways that the school was able to determine whether those with denial of its right to live there, denial of permission of its right to live there, the scholarship money. Is there any evidence in the record that scholarship money was being used to fund his rent? So, Your Honor, I think that the best the university has not disputed that in any of its filed briefs. I think some of the best evidence there, and I'm trying to think how we found that that's a trial. How do you prove that? How would we prove that Bradford had taken the rent? What evidence would you call how he overcome any potential he or she problems? Sure, I think the new degree would be a good way to comment because she helped him apply for the apartment, and if there's an email at 121, she talks about her understanding that he was using scholarships. And if I may, I would like to reserve my time. There's also a text entry where they say between Mr. Groot and Ms. Brown that he couldn't afford to go to the University of Arizona without a scholarship. That's correct, Your Honor, and Ms. Brown's expert said that's a general matter when athletes, elite athletes on this kind of scholarship are patriarchal teens. Their scholarship, they leave the university entirely. Wasn't there also testimony from the football coach that they would regulate what happened in an off-campus apartment with regard to not smoking dope, not underage drinking, don't do drunk driving. So there were a lot of other restrictions that the athletic department and the football coaches imposed on these off-campus residences. Isn't that right? That's correct, Your Honor. And the university does well when describing the kinds of conduct that the coach looked for to determine if a player was behaving well off-campus. The coach specifically mentioned gender violence by giving a staring print that a coach who would require someone to move back on campus because he was a couple minutes late to class would also take action if he had actually tried to murder someone. It seems in your brief, although you are mentioning it today, that you're not relying as much on the summary judgment standard that all reasonable inferences have to be drawn in favor of the non-moving party or that the standard is just whether there would be any reasonable fact-finders that could find in your client's favor. Why is that? Do you want to have... You don't think that's that important in this context, or...? I think that it is certainly important, Your Honor, because all that McKenzie needs to show is that there is a dispute of fact. All of the evidence should be viewed in a way that's favorable to her. I think perhaps the reason why we didn't rely heavily on that is because there's a lot of undisputed evidence that shows control. But it's certainly true that this is ultimately viewed as a repression, as is often true for matters of degree. Another thing you didn't address in your brief is the forfeiture argument. You appear to have disclaimed your theory. Can you address that? Sure. So I'll be talking at the end in the earlier argument, but our focus is now on the control that the school had over the football house, and the court has repeatedly held that they can reach issues or arguments that are raised for the first time in a petition for re-hearing on bond. One recent case for that is Hernandez-Estrada, 749 F. 3rd, 1154. Here, the case now comes before having been fully briefed. This is actually the scenario that in Sokoff-Gonzalez v. INS, the court said is particularly appropriate one for the on-bond court to reach the issue where the argument didn't reach by the parties, but the panel reaches it. They get the law wrong. The party asks the court to go on bond to resolve that issue, and the court does so at that point. It makes sense. It might, in fact, be in terms of encouraging the incentives for the court to reach the issue in that sort of event. I know you're trying to take time. I'll give you some time. I have a question for you. Given the university's exceptional control, level of control over Division I athletes, is there any limit to the university's liability for Bradford's actions? Yes, Your Honor. So some of those are just very clearly built into David that the school would not be vicariously liable for activities as in delivering different actual knowledge, showing that the harassment was so severe and pervasive as to affect the victim's education, as it clearly did in this case, really putting a hard man to a tail line. But I'd also say to perhaps the university's hypothetical about an assault between two students that randomly come across each other in Alaska and there's no touch to the school, even in the Salem to Africa example, as a Division I athlete, you may not get control there. That's certainly a key concept of the edge of control at best. And here, as you know, there's a really remarkable amount of control put in at the heartland. So is it your position that for Division I athletes, the concept element of David will always be met because of the control they have over the scholarship? No, Your Honor. And that goes against the Alaska hypothetical, where there's nothing that the school could have done with the scholarship or otherwise to keep two students from randomly running into each other out of state in the way that the university describes in the hypothetical, where it's really going out of its way to write out any type of or any causation to the school. But to the extent that the university, first of all, got the idea that perhaps it might have a greater degree of control over a house full of Division I athletes and a house full of non-athletes, that's only a reflection of the division that the university itself decided to draw in its own regulation. That is, the university has decided to regulate more closely the lives of athletes, including over their living arrangements, than over non-athletes. And the court doesn't have to ignore those facts, especially at summary judgment. Excuse me. One more question. You had mentioned scholarship as perhaps evidence of control in the context of abusive harassment. As a practical matter, it does seem a little bit odd that the university could be held liable if the student is from lower income and thus receives a scholarship but may not be liable if it's a trust fund kid who is an abuser and therefore the university doesn't offer him a scholarship. Is there kind of an odd result by just relying on the scholarships as context of harassment? Your Honor, I think what's important here is the scholarship is simply one more degree of control. We're talking about control over a student's degree. The scholarship is a couple more points, but even without the scholarship, the school would have enough control over this context because to my mind, the relevance of the scholarship is that by revoking the scholarship, the university would have greatly reduced the chances that Bradford was living in that house, living in the context of the university life writ large, but the university also had a more direct way to effectuate that result, which was either tell him he has to live on campus or expel him from the school altogether and both of those forms of power would be available for the trust fund kid as well. I've lived with universities for many years in my career. If he had not been a football player and he'd been charged and we'd had already the conduct with respect to student day and DeGroote, he would have been kicked out, period. I think that that's probably correct, Your Honor. We can either resolve it. Jocelyn, did you have any questions? Jocelyn's afraid of my video. No? Okay. Thank you. May it please the court, Jason Lee for the United States of Amicus. This court should reverse the district court's ruling and hold that a school's disciplinary authority can, in certain circumstances, demonstrate a school's control over the context in which harassment occurs. Arizona errs in arguing categorically to the contrary that disciplinary authority can never satisfy control over context. That would mean that where a school knows that a student is being sexually harassed off campus and has multiple disciplinary actions that it could take to prevent that harassment, it would not even be the possibility of liability under Title IX. Can I ask, just under your client's position in the Department of Education, I think it was a matter where the abuse occurred in terms of a geographic location as long as it was perpetrated by this individual. Is that a fair statement or no? Geography is not determinative, but it's certainly relevant. For example, the location where harassment takes place can inform a reasonable juror or a court's determination of whether or not there's control over context. Let me give an example. A school's disciplinary authority over a student necessarily will depend or will change if the student's in in-campus housing versus... Just in this case, though, under the position you've staked out, it seems to me that it would not matter if the abuse had occurred 100% of it had occurred in the car parked outside the house or parked at a gas station five miles away. Your position you've staked out is much broader, and it suggests that as long as the school has disciplinary authority over this individual, that's going to be sufficient, but if that's wrong, I'd love to hear your response. No, we're definitely not taking a categorical position that disciplinary authority always will divide, but that it can at certain circumstances, and at least here, the types of disciplinary action that could have been taken by the school to at least create a jury question on substantial control. Excuse me. You seem to go to control over the individual, which I didn't understand was a dispute. We're talking about context. It can't be that these two tests are the same thing. So how is just control over the individual distinct from context in your view? I have two responses to that, Your Honor. They are distinct, but they are also trying to get at the same fundamental thing, which is, did the school have some reasonable action it could take to prevent the harassment from taking place, or at least reduce the risk of harassment? Now to get to your more fundamental question, are these two factors distinct? Yes, they are, but they can't be pulled apart and totally isolated in the way things you're saying goes to the first factor. And so, I mean, every argument I've heard so far suggests that if you meet the first factor, you also meet the second factor. So I'm trying to give you an example of something that would meet the second factor, but not the first factor. That would meet substantial context. But wouldn't satisfy, well, I guess you don't have to say that it wouldn't satisfy, but what would only satisfy the second factor? The context. For example, many universities rent out their campuses for summer camps. In that context, the school might have substantial control over the dorm, where a private camp is taking place, but they wouldn't necessarily have disciplinary authority over the campus themselves. I want to make this very, very clear. This is a context-specific analysis. By definition, you're looking at a school's substantial control over a particular context. There are certain times where a school can derive control over a context because of the people that are there. For example, that school might not own a fraternity house, but they can say Saturday, 10 p.m., no alcohol will be served because in that context, there will be individuals there who are members of the school university. It's put on by members of a recognized student group, and it will be hosting an event that's open to the rest of the academic community. So the fact that these two factors can, in certain times, overlap, that's what's not remarkable under Davis. Under Davis, many of the students have the ability to take corrective action. That informs whether or not there's actual knowledge by a qualified student individual, like Judge Smith mentioned. It also goes to whether or not a school responds with deliberately indifferent. So the fact that some of the factors may overlap, they may try and get at the same thing, that's not unremarkable. I don't have the understanding of the facts of this case. What administrates control over the off-campus apartment, the ability to deny permission to live there? What else? If I could take one second to set the stage and then get into those facts. What we're looking at here is one sentence. What we're looking at here is whether or not there's sufficient individual control, and the form of that control doesn't necessarily matter. It's what the school could have done. Here, we know the school had some exercise over Bradford's off-campus conduct. There's a code of conduct that explicitly applied off-campus. That's what was told to student A. You had regulation of his off-campus conduct in the no-contact order, which was expressed in saying it applied off-campus. You have the school's specific finding in expelling him that his conduct posed a danger to other members of the academic community, including on-campus. That's all with the university. You independently have alternative basis with the football team's regulatory authority. They conditioned, not only did they subsidize his ability to live off-campus, but they conditioned it on certain restrictions on his conduct, and they had a categorical rule that you cannot engage in any type of assaulted behavior against women. Those are all independent basis that a reasonable juror could conclude could demonstrate substantial control by the school, that there was some reasonable ability by the school to lower the risk of harassment. And what's the government's best example of a person employed by the university that was engaged in deliberate indifference in the context described in the Davis case? We don't take any position on actual knowledge in this case, but I think your question, Judge Smith, is insightful because it recognizes that it's the other factors of Davis that really do the heavy lifting here. Those are the factors that impose reasonable limits on liability. And his law certainly bears that out. All we're asking here is whether or not there's a threshold indicia of control showing that this harassment occurred. I get that. I get that. But again, to your point about Davis, it seemed to me that Justice O'Connor's opinion was very careful. They want to be sure that they're not throwing the entire educational institution into a situation where a little here, a little there, and all of a sudden they have enormous liability. They wanted to be certain that you had people who knew what outrageous thing was going on and that that person, empowered person, was deliberately indifferent to what was going on. And that's what I'm trying to hear my colleagues point out in terms of the context. If you had somebody in a car or whatever, it's far more difficult. They wouldn't know about it. It gets more into the individual stuff that actually happened in the Davis case. And that's what I'm struggling with in this case. You've got people in the one department who seem to know some things. Is it the government's position that anybody in the university community who had knowledge and who did not report it to somebody who had power to change things was deliberately indifferent? Is that your position? No, that's not our position. And again, we don't take any position on actual knowledge in this case. But one of your questions I think gets to some of the concerns that were raised by Judge Watford, which is the extent of this theory of liability. I mentioned earlier this is just a threshold function, a threshold question in the analysis. It doesn't give rise to liability. I want to make very clear. But in terms of the limits of disciplinary authority and control, really all we're asking this court to recognize is that schools have broad discretion in how they set up their operations, the type of conditions they can place on participation in the programs and activities, the scope of their operations. All Congress did was to say in Title IX, however you choose to set up your operations, Title IX applies in that context. And the operations of, for example, an online-only school, a virtual school, is going to be very different than the type of control exercise, the type of disciplinary authority at hand for a traditional school. And so all we're saying is the limit really is what has the school exerted substantial control over in what type of context, what type of student conduct, is it interactions between students, is it conduct that's going to put other members of the school body at risk, which is the exact type of policy the University of Arizona had here. And so all this court would be recognizing is a couple different points. First, it's whether or not the harassment occurred under a school's operations. And second, whether or not there was some reasonable ability. If the test is so fact-specific and has to be determined on a case-by-case basis, how can schools have a good sense of when there might be liability and how they're supposed to modify their conduct to avoid liability when it's been satisfied. Again, schools have their own discretion in terms of how they set things up. What type of programs they're going to affiliate with, what type of on-campus programs they're going to offer versus off-campus programs, what type of guarantees do they want to make sure that their students have. So it's just recognizing that if you're exerting control over certain types of on-campus conduct, off-campus conduct, then you need to make sure that in a pre-assault case that you're responding not clearly and reasonably, and that's all that Davis recognizes. And I think that's the important part of this case, that we're dealing with a pre-assault claim. So that's for two reasons. First, we know that there was some knowledge by the school of a heightened risk of sexual harassment. And in that context, all a school needs to do is act not clearly and reasonably. The second relevance for the fact that this is a pre-assault claim is we have evidence of what the school did in response to that knowledge. It did a variety of different things. It issued a no-contact order saying, you know what, you cannot interact with this student off-campus, thus showing some restrictions of reference conduct in an off-campus conduct context. They also exercised control over where he could live. When they issued that no-contact order, they said, you have to move dorms. We need to keep you away from this person to whom you pose a significant risk. And so again, the fact that this is a pre-assault case, a pre-assault claim, provides some indicia of control based on what the school did in response to that knowledge. Does the department have a view as to which factor is perhaps most important? Any. Is it likely to be dispositive? I think there's at least five reasons on which to find substantial control, and I mentioned that here a little bit earlier. The no-contact order, the code of conduct. So nothing is more dispositive. I'm saying in general, not necessarily specific to this case. We don't take a position on which one is the most forceful piece here, but at least in the totality of these circumstances, at a minimum, there's a jury question. The facts here are bad for the university, because I think there's a lot of evidence that Mr. Bradford committed abuse against other female students, but supposing cases where one student is accused of abuse or harassment, but that student strongly denies it, and it's a little bit murky. Wouldn't the government's position create incentive for universities to basically expel students who have been accused because of potential liability? And the easiest way to avoid liability is to expel the student. And ultimately, two universities, large universities, one student being expelled isn't a big deal. No, Your Honor. The universities have a number of reasons to do exactly what the school did here, which is regulate certain types of off-campus conduct. If I could just give a quick list. Of course, the schools want to ensure a safe learning environment for all students. There's the fact that off-campus harassment often will have an impact on the on-campus environment, and schools have an interest in protecting the on-campus environment. Schools also have an interest in protecting the integrity of their off-campus programs and activities. There's also the regulatory interest to make sure that schools respond to off-campus bullying and harassment. That was discussed by the Supreme Court in Mahanoy. And then, I think all of those provide good reasons for schools generally to do exactly as the school did here, which is restrict types of off-campus misconduct, which poses a danger to the physical safety of other members of the academic community. Unless there are any further questions, thank you for the time. This Court should reverse. I have a question. Oh. I'm sorry. Don't worry. I wonder if the Department has a definition of the term context. Because we've argued that the Court used the term context interchangeably with the word environment. And when I read Davis, there's nothing in Davis that suggests to me that physical location is the definition of context. It is a factor. It is a dictionary definition of context that says context means the overall circumstances in which an event occurred. So, I'm wondering how would you define context? Yes, Your Honor. Context, as you said, is not geography. The Supreme Court did not say location. They purposefully used a broad term, context. And that can include geography. It can also include time. It can include who the individual is with. It can include the type of interaction that's being regulated by the school. It can include historical context. It can include past practice by the school or its officials. So, yes, it's definitely not geography. So, is it geography to be considered at all? Yes, Your Honor. As I mentioned, a school's control over a student will differ depending on if he's in an on-campus dorm room or if he's at his parents' house. So, that's baked in. Thank you very much. Thank you, Your Honor. Good afternoon, and may it please the Court. Stephanie Elliott for the State of Arizona and the Arizona Board of Regents. Mackenzie Brown would not have spoken in the context of a university program or activity, and she didn't argue that she was until she petitioned for rehearing. The Court should affirm the judgment below for three independent yet equally dispositive reasons. First, the defense argument that Brown has now adopted regarding control over Bradford's off-campus residence is not properly before this Court. Second, even if the argument is considered, it fails under Davis. And third, even if the argument could survive under Davis, it fails on the facts of this case. I'll discuss each in turn. First, entertaining the argument that Brown has disclaimed throughout litigation but has adopted now only during the rehearing would be in direct opposition to the Supreme Court's recent ruling in Zinning Smith. Brown's argument was first presented by Judge Fletcher in his dissent in the non-vacated opinion, but she expressly disclaims that theory every step of the way. And I'd like to point quickly to one sentence of her opening brief from page 20. She says here, the Title IX violations alleged by McKenzie are in the nature of intentional failure to correct known on-campus harassment, not intentional failure to prevent assault in off-campus housing. Yet that is what she argues to appear today. She went on to say that the question is quote, not whether it has sufficient control over the context in which she was later attacked. Yet that is what we are here discussing today. She's adopted this new argument now, but this wasn't the case that was presented to the district court, and it wasn't the case that was presented to this court in briefing or in oral argument. Are you resting your argument on the Supreme Court's case and sentencing Smith? Yes, Your Honor, I am, but also on the general case law saying that this court does not entertain arguments that were waived below, that it does not generally entertain arguments that were not presented in briefing, or arguments that were, in this case, not just waived, but forfeited. Let me first ask you about I'm sure you know what happened there was the three-judge panel invited three amici to submit briefs on issues, not just arguments, but on issues that had never been raised by any of the parties. And Justice Ginsburg's opinion really talks about not waiver, but about the panel violating the principle of party representation. Now, here we're talking about an argument that was not made, or rather an argument that was made in a broader form than the argument that I advanced. We've got case law that says well, you can waive a claim, but if the claim is the same but it's a different argument, you don't waive the argument. How do you respond to that? Well, Your Honor, the argument was not made in a broader sense. I'm asking you the following. We have case law that says you can waive a claim, but if it's the same claim, but the argument under the claim is different. The argument is not waived. Ms. Brown is not really making the same claim. The claim that Ms. Brown made throughout this litigation was that the University was deliberately indifferent to the harassment that Bradford inflicted on women before her, and that the basis for liability on the University was the actions that allegedly did not take in response to those assaults. That's a different claim than the claim she alleges now where she seeks to hold the University's claim is a violation of Title IX. Then the argument says why the Title IX was violated. Respectfully, Your Honor, I believe that her claim has shifted from the claim that was initially litigated, and the importance of that, which does go to the reasoning in sentencing Smith, is that the deviation from the party presentation principle, it speaks to fairness and neutrality, but it also speaks to the prejudice of raising a claim now that was never litigated all through this case. Discovery was not targeted at this claim because it was never made. This argument was never made until now during the rehearing, and part of the problem with our factual record and when we ask questions about what are the facts in the record, what facts support these arguments, they were never developed by either party because this argument was never made. But in sentencing Smith, the over-breath argument was over-breath claim was never asserted by sentencing Smith. There wasn't any sort of morphing of an over-breath claim as you say there has been here. Is that right? The over-breath claim was not raised in sentencing Smith. That's correct. But it was what the court discussed in sentencing Smith was that the panel had injected and I believe the words used in the opinion were that the panel had injected a new argument into the appeal. And this argument also made its way into the appeal after the initial panel had unanimously rejected the argument that Brown made initially. And for that reason, this panel should be looking at this case and analyzing this case from the perspective of Brown's initial argument, which was that she need not show control over the context of her own harassment. And I suppose before we get to your question for a moment, can you address the control over context? Mr. Lee and Ms. Brodsky extensively discussed the breadth of the disciplinary authority including the decision as to where Bradford could live. Certainly, Your Honor, I have questions about the jury, whether he wins or not before a jury is a totally different question. Well, respectfully, Your Honor, every fact, every element of control that Brown has put forth and that the United States Department of Education puts forth goes to the control over harasser element. In Davis, the Supreme Court went to great lengths to cabin the range of actionable misconduct to suit the text and the purpose of Title IX. And part of the way it did that was to set these two separate control elements which have related but separate purposes. And the purpose of the control over the context element is to tether liability to the text of the statute, but there's substantial overlap. So the facts demonstrate both control over Mr. Bradford as well as control over the context in which the abuse occurs. For example, determining where he gets to live, the ability to move him back to campus, the funds that may be used to pay for his apartment, et cetera. How do you deal with those facts? And specifically, I go back to, again, the summary judgment standard. Why aren't these questions a fact for the jury to decide? Your Honor, my answer has two parts, sort of a legal part and a factual part. The legal part is that those factors respectfully do not necessarily overlap. Those factors that you're describing give the university control over Bradford. They don't give the university control over this off-campus residence, which is the context in which Ms. Brown was abused, not just because it was off-campus, but also because it had no connection to any university program or activity. My factual answer to that is that the viewing the fact or let me actually go back to the way that Brown has described the control over the context element as whether or not the university through its disciplinary authority has the power to reduce risk in that context. So the problem with the way the facts have been characterized here is that it's been put forth that the university had some ability to actually prohibit Bradford from living in that residence. It did not. The testimony regarding Coach Rodriguez's football team rule indicated that it was related only to players meeting their academic and team obligations. First, there's nothing in the record to indicate Bradford didn't meet those obligations. But second, and maybe more importantly, is what that rule doesn't do. It doesn't give the authority to tell him he had to move out of that house. This is the control over context-only allocation-based inquiry, in your view. Or can we consider other facts? It is absolutely not simply location-based, Your Honor. So what would you say are the other facts we can consider for the context? Control over context is not based on geography. It is based on actual control. And I think you can look at other controls for it. Over the context of the abuse, in this case, the context of her abuse was this off-campus residence that was unrelated to a university program or activity. But I think you can look to other cases to see examples of control over context. For example, in Hurley, the court found that there was control over context not because the school had the ability to discipline the harassers. It found control over context because the harassing messages originated on campus. They were transmitted via the university's Wi-Fi network or servers. They concerned students and on-campus events. And the court found that the school literally had control over that context, even though it was cyber harassment. If I'm wrong, the Supreme Court repeatedly pointed to the school's disciplinary authority as a key criterion for assessing whether the school exercised substantial control over the context of harassment. So why shouldn't we look at the disciplinary authority to assess here? I think that in Davis, the Supreme Court did not actually say that disciplinary authority was a key to control over the context. In Davis, the court had first launched a great length to set the two control elements. It easily found control over context in Davis because it happened on campus during school hours. It addressed that in a short paragraph. It dispensed with it quickly. It then went on to discuss the control over harasser element in the sense that it was holding that vicarious liability would not have pertinent in a student or was not applicable. It was sufficiently flexible to get into consideration, quote, the level of disciplinary authority available to the school. It does conclude that recipients of federal funding may be liable for subjecting their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and harassers under the school's disciplinary authority. Correct, Your Honor, but that portion of the opinion came after the Supreme Court had already found the control over context element and it was discussing then how the school could have control over the harasser, culminating in that sentence which indicated that there is control over the harasser, particularly when a school has disciplinary authority. The university issued a no-contact order to student A, which applied to Mr. Bradford off-campus, so it seems like the university understood that it had some control over his conduct when he was off-campus. Is that right? Correct, Your Honor. The university has disciplinary measures that it can impose that do reach off-campus, but that doesn't give the university control over the harasser.  In addition to the disciplinary measure, a student could commit misconduct. There are generally code of conduct provisions or sports team rules that will apply to students even in the off-campus context, but if that were enough, then your position is those are never enough. Football player rule 15 that regulates an athlete's conduct can never be enough, in addition with the disciplinary and remedial power that the school has, as well as any funding that the school may have in allowing that individual to live off-campus. Code of conduct rules or team rules that apply to player conduct go to control over harasser elements. We're talking in terms of context, but I want to get back for a second to the Davis concept of deliberate indifference. What is the university's or the state of Arizona's position about whether there has ever been any deliberate indifference in this case? Your colleague on the other side has not given me an answer, and the government says they're not going to do that either. Is it the position of the state of Arizona, and specifically the university here, that there was no incident where the university or anyone employed by the university committed deliberate indifference? Is that your position? Yes, Your Honor, our position, we argued it below, and we also argued it in the initial appeal, is that the district court's ruling could be affirmed on that basis as well. And in this case, it's important to note that before Ms. Brown reported, which is in that relevant time period that we're talking about here, the information that the university had was limited to information regarding student aid and some limited information regarding a possible second victim. The university addressed and remediated student aid concerns while respecting her wishes to not participate in a university being a student or a Title IX investigation. And the Department of Education during their argument pointed that out as well. The university took several steps to remediate the notice that it had about student aid, and it did that to her satisfaction. Both students, as I recall, at least initially, declined to do anything. Is that correct? Student aid declined to move forward with the university investigation. The second student, Ms. DeGroote, did not report to the university. The university attempted to look into some reports that it had, but she did not report to the university. But as to student aid, the university wasn't deliberately indifferent. It took the steps available to it while respecting her wishes, and it took the steps that did indeed remediate her concerns. Well, at the very least, from your perspective, deliberate indifference, at least as Justice O'Connor described it, would make an outrageous failure to take an action that was demanded under the circumstances. I gather that it's the state's position that at least with respect to these first two women, that what the university did was not of that nature. They may have been able to do a little bit better, but it wasn't deliberate indifference. And what happened to Ms. Brown, which is a horrendous thing, was not something that they would necessarily have had forecast, and that they could not necessarily have been held liable for that. Is that your position? That is correct, Your Honor. And not only could the university not forecast what was going to happen to Ms. Brown, but it couldn't have done anything to prevent that. What we've discussed today repeatedly Wait a minute, wait a minute. What do you mean they could not have done anything to prevent that? If they had reported it to a football coach, we have uncontradicted evidence from a football coach that Mr. Bradford would have lost his scholarship and he would have been gone from the university. So, they could have done something. Now, the question as to whether they have an obligation to do it is a different thing. When you say they couldn't have done anything, that's not true. Respectfully, Your Honor, that cascade of events that you've described where it's reported to the football coach and various things that happen after that are based on several layers of speculation that are not supported in the record. No, it's based on what the football coach said. The football coach's testimony in the record was of course he was deposed after the fact that he would have kicked Bradford off the team. That is within the record. The coach, whether or not that would have resulted in Bradford's loss of his athletic scholarship or expulsion, that is a different story. There's no facts in the record that go to that because that argument had not been made below. But what we do know is that he would be entitled to due process before either of those actions were taken. And with the reports that the university had at the time, whether or not those would be successful, maybe they would, maybe they wouldn't. But more importantly, even if Bradford was expelled from the University of Arizona, that does not kick him out of his house. His house was privately owned. The university could not regulate who could and couldn't live there. She leaked it from a private owner. They couldn't network. The only thing in the record, Your Honor, though, is that he had a scholarship. The record doesn't contain any details about the scholarship, and the record doesn't contain facts indicating that he necessarily paid his rent with scholarship money as opposed to money he got from somewhere else.   developed below because of the fact that Bradford was expelled from the University of Arizona because this argument wasn't raised. He would have never had a reason to develop it below. That is absolutely correct, Your Honor. Presumably, both parties would have developed additional facts below had it ever been to disclose legal theory, and it wasn't. But the record doesn't have facts indicating if he paid it with his scholarship money or if the money was evidence in the record. And I think it's a reference to one piece of evidence in the past. There is not actually evidence in the record that he paid it with scholarship funds. Both, I think, afford to live there otherwise. Sure. The two women that had dated him, texting back and forth, said that they didn't think he could afford to live there otherwise. But Ms. DeGroote also testified in her deposition in the CHS in the record that she assumed he paid for it with scholarship funds, but she didn't really know. The record doesn't indicate there's any basis that that would be admissible or that there's anything other than her personal speculation. But also, and perhaps more importantly, Brown has not presented any case law indicating that the university has substantial control over anything and everything paid for with scholarship funds. Indeed, the implications of that kind of ruling would be far-ranging, not just for Title IX, but for negligence generally. If I could, yeah. Hypothetically, I'm trying to understand the difference between the context and the control. A law school dean, it comes to the attention of a university president that a law school dean has been harassing women at a law school. The university president gets that information and doesn't take immediate action. Then the law school dean invites a young woman up to his off-campus apartment, which is paid for through the contract between the university and the dean. His treats are in the apartment, off-campus. Under your reading of Davis, would the school be on the hook? I think, Your Honor, that I can't totally answer that without knowing all the facts, but I think it would be a closer call. If there was evidence that the university could regulate that context, I also think it may be different because he's a teacher, but aside from that... He's a professor in Detroit, but the relationship is the context is what I'm getting at. Correct. The context is that it's an off-campus apartment that the school pays for because he's the dean of the law school. I think that it would be a closer call and that additional facts would have to be developed to determine if the university had substantial control over that context, given the fact that you state if the university could regulate that apartment, if the university could, for example, kick him out of that apartment, tell him he couldn't rent it anymore, those things could be a dish out of actual control over that context. But you're saying you do imagine a situation where those are the facts and the university would not be liable, even though the dean of the law school is abusing people in his apartment and they're on notice. You're saying there's a scenario you could see where the school would not be liable under Title IX for that. If the school does not have substantial control over the context in which it occurred. Again, that would be so fact-specific. I fear I can't give a totally accurate answer to your question. Bradford's coach, I think it was referenced earlier, immediately kicked Bradford off the team once he learned that Bradford actually assaulted Brown, even though the assault occurred off campus residence. Why doesn't that show that the university had control over the context of the assault? That shows that the university had the ability to discipline Bradford. It shows, why can't it show both? Because the elements are separate and the ability to discipline Bradford, they would have the ability to discipline Bradford for assaulting a woman no matter where he did it, but that doesn't give them substantial control over if he did it at his parents' house or in a hotel on spring break or over the summer, it wouldn't give them substantial control over those contexts either. That's why we look at the context and the facts here. I don't know, I'm trying to figure this out, but here it was off campus, but the coach then kicked him off the team once the abuse occurred, even though it was off campus. Of course, your honor, but respectfully, that still goes to the control over the harasser element, and you would have to show something different to show also the control over the context, the reason being because the school can't be liable unless this harassment is occurring under its education of programs or activities. Having disciplinary authority over students, even when they commit some kind of misconduct potentially off campus, does not mean that their misconduct is now occurring under an education program or activity. So to follow up on my colleague's question, if Bradford had abused Ms. Brown at his home, wherever that happened to be, and the coach found out about it under their rules, he could have still kicked him off the team, right? Correct. So it didn't really matter where he was at that time, correct, just in the context. And I think you said earlier that he would have had due process so that under Arizona's rules, if he were kicked off the team, there would be a proceeding that would occur in which the school would say, we want to remove his scholarship, and he could then defend and see what they could keep, is that right? There would be a proceeding. I don't exactly know the details because none of that is in the record because this was not something that was located below. But I do know that there would need to be due process, there would be proceedings, and he would be entitled to those constitutional protections just as any other student would. And the fact that what he did to Ms. Brown occurred, then he was kicked off the team. I don't know how long it takes to get people out of a rental in Arizona, but it would be some period of time where that property would almost be irrelevant in terms of at that point, right? The property is the context in which it occurs, is that correct? He's off campus residence, unrelated to a university program or activity is the context where this assault occurred. In terms of him getting kicked out of that property, I don't have any information on that because it was owned by a private owner who theoretically could have let Bradford live there, whether or not he was a football player or whether or not he was a student at the University of Arizona. Isn't it a little bit ironic that we're talking about, oh, I didn't at the school take this action to kick him off the football team, and yet, if they did, they actually would have lost the control over the context. Because, I mean, the flip side of this is, oh, well, it's the football rule that says you can live off campus. Well, if you expelled them from the team, kicked them off the team, then they would have had no control over the context. So, aren't we just imposing like an exact behavior and just trying to take Arizona to the bank when there's nothing about the context that's raised here? Yes, Your Honor, I think that's absolutely correct, and I think that Brown is attempting here to use Title IX to combat all harassment that occurs between students. Well, how good is your view if there's been definitive evidence through discovery below that the university in fact paid for the department? Would that be a different case? No, I don't believe there's just funds paid for the department and there's definitive evidence of that developed through discovery. No, I don't think that would be a different case. Sorry, Your Honor. No, I don't think that would be a different case, because there's still no legal authority that says that the university has substantial control over everything purchased with scholarship money. Practically, that would put the university in a position of having... The other question is, what if they gave scholarship money that was specifically, I don't know how to use this, but it was specifically designed to cover housing. If they said, what if they gave a housing statement and you couldn't use that money unless it was for housing, that would be control over context, wouldn't it? I don't know if that's the thing. I don't know if it would necessarily be, because I think still, and maybe that would be a fact that could be considered, but it would still depend on whether the university actually has control over the context. I think I asked that question because Jess Olins gave the example of the university being in an off-campus apartment committing misconduct with young women, and you said, well, that really would be a much closer case. If you were to, or if the plaintiffs were able to establish that university funds, let's say you got a full ride, tuition is completely covered, you got a stipend for living expenses, and as part of living expenses, he's paying for this off-campus apartment, would that be any different than the university being in school funded housing example? Well, because I think, as you guys stated, in response to that hypothetical, it would depend not just on whether the university is paying for the apartment, but whether it has control over it. Can it regulate it? Can it kick that person? Can it kick the dean out of that apartment and say, oh, you violated a mini-regulation here? That's actually not what our factual record indicates. Coach Rodriguez had some level of influence over him if he didn't meet his academic or his team obligations. But even if Coach Rodriguez could discipline him within the context of the football team, he cannot force him to move out of the house. He cannot force him to move into a dorm. And the reason he can't force that is because he doesn't have control over the off-campus housing. Again, this is an factual record one way or the other, but Bradford could say, well, forget it, I don't want to play football anymore, I want to live in this house. And that owner can say, great, live in the house. And the university can't do anything about it because it doesn't have the control. It doesn't have the authority to do anything about him living in the house. And that's the reason that this... When it comes to physical violence, physical abuse, I mean, does the control or the context really matter that much as a practical matter? I mean, here in this case, Bradford used two women for dorms. It seems like the university didn't have much control over it or regulate it or do much about it. So when it occurs in a dorm or a private apartment, does the control over context matter that much? I want to address that with two parts. And the first is, yes, control over context does matter. The Supreme Court set the control over context element specifically to make sure that liability was staying within the text of Title IX, which explicitly requires that actionable harassment occur in a program or activity of the student. And the second part  the control over context element, it has an important purpose. It is not served by the other elements, and it is required by the Supreme Court. The second part of my answer just addresses that they did take action upon learning of the first two women. They took the action that they could take and the action that was appropriate under the guidance that was in effect at that time to remediate the effects on student A. They did take that action, which also goes to the deliberate indifference portion. But control over context is very important, and it is a required element. And it is I see that my time is running short, so if I may just go ahead and make a concluding statement. Thank you, Your Honor. Brown's argument expands and distorts Title IX's private right of action under Davis to cover far more conduct than was intended by Congress or the Supreme Court. She is attempting to use Title IX as a weapon to combat all sexual harassment that occurs between students. But her argument fails under controlling law, and it fails on the facts of this case. The district court should be affirmed. Thank you. I'll come forward, but I'll give you three minutes. Thank you. I appreciate the time. I'd like to clarify the claim, clarify the standard, and talk about deliberate indifference. The claim in this case has always been a pre-involved Title IX case, that the university deliberate indifference to graduates passed the views of other women of which the school had actual knowledge. You didn't advance this argument below. Judge Fletcher adopted, and now you're latching onto it, right? The argument wasn't passed. I didn't The discovery was conducted, and no discovery was done geared towards this. If this goes back down, they are forced to go to trial not having had the opportunity to prove some of these things that we're latching our attention to. That's not correct, Your Honor. So first of all, there was no motion to dismiss in this case. So the university had no idea what arguments with McKenzie was going to advance during discovery. And indeed, the university's briefing below is all about whether the university had control over the context in which McKenzie was abused. As to the standard, I just want to clarify the university's earlier stated standard. It's not subject that school may have control over a context if its disciplinary authority gives it the power to reduce harassment in the context. But there are other ways that a school can also exert control, and the Hurley case from the Fourth Circuit that the university mentioned is a great example. Not all of the harassment there happened on campus. You won't be surprised that I want to go back to deliberate indifference, which to me is determinedly purely inappropriate.  discussion of student A. As has been pointed out with student A, when the Title IX office found out about this, they notified the coaches. The coaches had suspended Bradford for three days. They had no lessons about drinking. It was a problem there. So they did do something with respect to student A. With respect to Mr. Groot. I don't have the timing on this, but they apparently were in the process of doing something when something occurred with Brown. So, again, I want to help. I really want to help, but I need to know who committed deliberate indifference here. Outrageous acts by Bradford. No question about it. The issue of the context, I won't go over that again, but at the end of the group, things combined. If you're all over him, and the proper context, somebody has to have committed an act of deliberate indifference, and I'm asking you, who did it? Do you know students knew that Bradford had seriously abused both student A and Mr. Groot? And I would note that the district court actually affirmatively granted Mr. Groot summary judgment on the university's deliberate indifference. And yet the school did literally nothing to protect the rest of the student body, and the Department of Education has repeatedly recognized most recently in a 2021 question and answer document that the general matter of the school should try to respect the wishing of the past victim about whether to proceed with an investigation. The person you mentioned, that's your best case, right? So if we can't find deliberate indifference with him, you lose. I think that's no, Your Honor, because there are multiple people that the university does not dispute or appropriate persons, which is a relevant standard for whether their actions committed deliberate indifference based upon the knowledge they have vis-a-vis Bradford. Yes, Your Honor, that's correct. And I would note that we don't know what Leo would have wanted to do if no one bothered to ask her. And the Department of Education has noted that at a certain point, a university has a broader responsibility under Title IX to the larger student body to protect them. And just to leave you with the ramifications of the university's position that page 17 of its supplemental brief, it says that under its version of control, the university could affirmatively encourage its students to engage in off-campus sexual harassment of their peers that disrupts their peers' education, and that would be actionable under Title IX. That can't be reconciled with the text, and that cannot be reconciled with the purpose and spirit of Title IX. Thank you. Thank you very much, Ms. Brodsky, Mr. Lee, and Ms. Elliott. Thank you very much for your four argument presentations here today. The case of McKenzie Brown versus Native Arizona Board of Regents and Richard E. Rodriguez, U.S. Department of Education, and Milstead. Thank you very much. We're adjourned. This order is adjourned. Thank you.
judges: MURGUIA, FLETCHER, RAWLINSON, SMITH, NGUYEN, WATFORD, OWENS, NELSON, LEE, KOH, SUNG